U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 FEB 23 AM 9: 57

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

LARRY GEORGE CHEESEMAN,       )
                             )
        Plaintiff,            )
                             )
    v.                        )        Case No. 2:16-cv-00273
                             )
NANCY A. BERRYHILL,           )
Acting Commissioner of Social Security,  )
                             )
        Defendant.            )

**OPINION AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE**
**COMMISSIONER'S DECISION AND DENYING THE COMMISSIONER'S**
**MOTION TO AFFIRM AND REMANDING FOR A NEW HEARING**
(Docs. 7 & 12)

Plaintiff Larry George Cheeseman is a claimant for Social Security Disability

Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits under the Social

Security Act. He brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision

of the Social Security Commissioner (the "Commissioner") that he is not entitled to

disability benefits because he is not disabled.[1] On March 24, 2017, Plaintiff filed his

motion to reverse the Commissioner's decision. (Doc. 7.) On July 24, 2017, the

Commissioner moved to affirm it. (Doc. 12.) On August 10, 2017, the court took the

matter under advisement.

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than 12
months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental
impairment or impairments" must be "of such severity" that the claimant is not only unable to do
any previous work but cannot, considering the claimant's age, education, and work experience,
engage in any other kind of substantial gainful work which exists in the national economy. 42
U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Plaintiff identifies the following errors in the Commissioner's decision: first, the Administrative Law Judge ("ALJ") failed to *sua sponte* develop the record on appeal after Plaintiff elected to proceed with his administrative hearing without representation. And second, that the Social Security Administration's Office of Disability Adjudication and Review Appeals Council ("Appeals Council") improperly denied Plaintiff's request for review on the basis of new or additional evidence.

David J. Strange, Esq. represents Plaintiff. Special Assistant United States Attorney Sandra M. Grossfeld represents the Commissioner.

## I.    Procedural History.

Plaintiff applied for SSDI on October 17, 2013, and subsequently applied for SSI on November 6, 2013. Plaintiff's applications were both initially denied on February 25, 2014, and again on reconsideration on May 9, 2014. Plaintiff requested further review by an ALJ on May 20, 2014.

At a September 15, 2015 hearing before ALJ Dory Sutker, Plaintiff appeared via video from Saint Johnsbury, Vermont and testified, as did his wife. ALJ Sutker presided over the hearing from New Hampshire and Vocational Expert ("VE") Elizabeth C. Laflamme appeared by telephone. At the commencement of the proceeding, Plaintiff informed ALJ Sutker that his attorney had withdrawn the day before the hearing. ALJ Sutker advised Plaintiff of his right to be represented, the ways in which representation could be beneficial to his case, and the possibility of postponing the hearing to enable Plaintiff to obtain a lawyer. ALJ Sutker also informed Plaintiff that some legal aid services provide representation free of charge to Social Security claimants with a demonstrated need. Plaintiff indicated that he understood his right to representation, and that "the best thing to do is to proceed[.]" (AR 211.)

At the hearing, Plaintiff acknowledged that he had an opportunity to review the exhibit list on the day of the hearing, and that the record evidence appeared complete.[2]

---

[2] "Q: Okay, the F Exhibits which would be the – the last bunch of exhibits contains the medical evidence we have. To your knowledge, do we have all the treatment records? . . . A: Yes, it

2

ALJ Sutker then explained the hearing process and issues to be determined, and asked Plaintiff on at least four separate occasions if he had any questions about the proceeding, the right to representation, or "just general questions you have before we get started[.]" (AR 214.) Plaintiff stated that he had no questions, and signed a written waiver of representation by counsel.

In a written decision dated October 29, 2015, ALJ Sutker found that Plaintiff was not disabled at any time following his alleged onset date of February 10, 2010. On December 18, 2015, Plaintiff filed a request for review by the Appeals Council arguing that ALJ Sutker "failed to fulfill her duty to develop the record where [Plaintiff's] representative withdrew one day before the hearing and there was an obvious 3-year gap in treatment records." (AR 8.) Plaintiff submitted three sets of medical records which were not before ALJ Sutker in connection with his appeal. On May 26, 2016, the Appeals Council denied Plaintiff's request for review. As a result, ALJ Sutker's October 29, 2015 written decision stands as the final decision of the Commissioner with regard to Plaintiff's 2013 benefits applications. On November 29, 2016, Plaintiff was awarded disability benefits as the result of a new application which determined his onset date to be August 30, 2016. Plaintiff's present appeal is of ALJ Sutker's denial of his October 2013 application, which alleged an onset date of February 10, 2010.

## II.    Factual Background.

Plaintiff is 54 years old and resides in Lunenburg, Vermont. He finished eleventh grade before entering the United States Navy at age 17, serving for three years. After his honorable discharge, Plaintiff worked as a handyman, landscaper, construction worker, and truck driver. He possesses a General Equivalency Degree and is able to read, but states that he struggles with simple arithmetic. Plaintiff alleges disability on the basis of chronic obstructive pulmonary disease ("COPD"), angina, degenerative disc disease, degenerative changes of the bilateral shoulders, anxiety disorder, major depressive disorder, and alcohol dependence.

---

looks like – it looks, like, we do." (AR 213-14.) However, twenty-one pages reflecting medical treatment over an approximate three-year period were missing.

## A. Medical History in the Administrative Record Before the ALJ.

Plaintiff alleges a disability onset date of February 10, 2010 because immediately prior to that date, on February 1, 2010, he was admitted to the Northeastern Vermont Regional Hospital ("NVRH") emergency room with "[a]typical chest pain" (AR 487) that he reported lasted approximately four days. Emergency room staff administered "2 nitroglycerine" which stopped Plaintiff's chest pain, but hospital staff expressed doubt that the pain was cardiac in nature. *Id.* A myocardial infarction was ruled out and a chest x-ray revealed "[n]o evidence of acute cardiopulmonary disease." (AR 567.) Plaintiff also reported double vision and facial/muscle weakness upon his admission. He was seen by a neurologist who conducted a full exam. The results suggested benign positional vertigo, and a modified Epley maneuver was performed. Plaintiff was discharged the following day.

Subsequent stress testing on a treadmill caused Plaintiff significant chest discomfort with shortness of breath and an abnormal EKG with 1-2 mm horizontal upsloping ST depression in the anterolateral leads. Cardiac catheterization was recommended, and scheduled as an outpatient procedure for February 4, 2010 at Fletcher Allen Health Care. The results of this diagnostic catheterization indicated "no significant epicardial coronary artery disease[,]" and the attending cardiologist "[s]uggest[ed] further diagnostic testing to evaluate possible non-cardiac sources of chest pain." (AR 638.)

On February 18, 2010, Plaintiff reported similar chest pain and dyspnea to that which prompted his February 1, 2010 admission to NVRH. Plaintiff also stated that he was not sleeping well, had anxiety attacks and nightmares, and was afraid to sleep. Medical staff at Saint Johnsbury Family Healthcare ("SJFH") ordered follow-up pulmonary testing which yielded a diagnosis of mild obstructive airway disease with no significant bronchodilatory response. Plaintiff met with SJFH medical staff on March 21, 2010 to discuss his pulmonary function testing results.

A June 21, 2010 notation in Plaintiff's chart from SJFH reflects that he "moved out of area in Florida[.] Records sent 06-21-10[.]" (AR 647.) The record evidence before the ALJ indicated that Plaintiff did not visit another healthcare provider until

4

October 1, 2013.[3] This represents an approximately three and a half year gap in Plaintiff's medical records. In August of 2013, a "new patient" entry stated that Plaintiff would "re[-]establish w[ith] S[ain]t J[ohnsbury][.] Florida for 3 y[ea]rs[.]" (AR 760.)

On October 1, 2013, Plaintiff visited SJFH to establish care and reported that he had been experiencing periodic chest pain for months and that he had early emphysema. His symptoms at this visit were improved, and he denied sleep or mood disturbances, fatigue, or a cough. His angina was "stable at present." (AR 754.) He did, however, complain of chronic back pain.

On October 14, 2013, Plaintiff reported to the emergency room at Weeks Medical Center in Lancaster, New Hampshire. His chief complaint was shortness of breath and chest pain. He also reported that his left arm went numb. Plaintiff's history of COPD was noted, but a chest x-ray revealed no acute cardiopulmonary process. Plaintiff was prescribed an albuterol inhaler for use as needed. Six days later, on October 20, 2013, Plaintiff appeared again at Weeks Medical Center's emergency room having taken his albuterol inhaler. "Upon arrival, he [was] notably anxious," and was given Duo-Nebs nebulizer treatment and Ativan, to which he responded well. (AR 731.) His final diagnoses from this visit were "[c]hronic obstructive pulmonary disease (COPD) exacerbation" and "[a]nxiety." (AR 732.) He was discharged with a five-day course of Prednisone.

On October 23, 2013, Plaintiff was seen at Concord Health Center ("CHC") in Concord, Vermont, where he stated that his shortness of breath had "gotten much worse." (AR 748.) Plaintiff's anxiety level was high and he reported experiencing panic attacks, dizziness, and blackouts. He stated that his symptoms were relatively stable, although his breathing problems had prompted him to close his business.

On November 6, 2013, Plaintiff was seen by Jeniane Daniels, MS PAC, at CHC and reported that he was trying to remain active through hunting and fishing but that he "gets quite [short of breath] with activities." (AR 812.) Plaintiff also reported exertional

---

[3] The record does reflect several visits to state health agency evaluators in Florida during 2010 and 2011 in connection with an earlier application for SSDI benefits.

5

chest pain requiring "nitro" on two occasions between October 23, 2013 and November 6, 2013. *Id.* CHC staff noted that his shortness of breath symptoms could be attributable to a combination of known pulmonary problems and new or undiagnosed cardiac pathology. A further follow up visit at CHC on November 20, 2013 revealed that Plaintiff was "doing about the same[.]" (AR 869.) Plaintiff reiterated his intent to retire from his business, stating to providers that "I just can't do the work anymore." (AR 869-70.)

Plaintiff underwent an annual physical exam on February 3, 2014 which indicated that "[o]verall patient is feeling well." (AR 868.) He denied any chest pain or palpitations, but did indicate that "he suffers quite chronically with arthritic pain (most prominent to low back)." *Id.* Plaintiff's blood pressure was also "well above goal" at this exam. *Id.* On February 7, 2014, Plaintiff was evaluated for COPD at North Country Hospital in Newport, Vermont. Veronika Jedlovszky, M.D. noted a diagnosis of mild obstructive airway disease in 2010 and opined that "the patient's airway disease probably has worsened since 4 years ago[.]" (AR 875.)

On March 18, 2014, Plaintiff requested an x-ray of his back because his "[pain] is not really any better esp[ecially] in cold weather[.]" (AR 888.) He indicated that he had begun working again after an SSDI denial, but that "[w]ith these activities, coupled with colder weather, [he] has experienced [a] flare of chronic low back pain and bilateral shoulder pain." (AR 889.) He had tenderness down to his lowest lumbar spine but retained full, "albeit slow," range of motion in both shoulders. *Id.* March 21, 2014 imaging revealed mild hypertrophic changes at the acromioclavicular joint in both shoulders consistent with mild degenerative joint disease. The same imaging also revealed end plate osteophytes at multiple levels of the lumbar spine, particularly at the L3-4 and L5-6 disc level. There were degenerative changes of the facets throughout, and the radiologist's impression was that of degenerative changes of the lumbar spine. A subsequent June 23, 2014 x-ray revealed "[b]ilateral neural foraminal narrowing at C6-7 and C7-T1." (AR 924.)

6

On July 18, 2014, Plaintiff was seen for low back pain in the Spine Center at Dartmouth-Hitchcock Medical Center. He reported that his current pain level was nine out of ten, and that his pain was aggravated by "lying supine or prone" and "extended sitting or standing[.]" (AR 900.) Plaintiff appeared to have "mild levoscoliosis and his left shoulder higher than his right." (AR 901.) His lumbar, lumbar musculature, and bilateral sciatic notches were all tender to palpation, and his trunk flexion was ten degrees and painful. An x-ray revealed that disc heights were well maintained but there were endplate osteophytes at multiple levels of the lumbar spine and degenerative changes of the facets throughout.

On August 13, 2014, Plaintiff underwent an MRI of his cervical spine. T1, T2, and T2-3D sagittal and T2 axial sequences were performed. The exam indicated mild disc bulging and small end plate osteophytes at C3-4, C4-5, and C5-6. There was moderate to severe loss of disc height at C6-7 with end plate osteophytes, mild concentric disc bulging, and bilateral neural foraminal narrowing. The radiologist's impression was that of degenerative disc changes at C5-6. On August 20, 2014 Plaintiff underwent a lumbosacral spine MRI which indicated disc disintegration at L3-4, L4-5, and L5-S1 along with mild bilateral neural foraminal narrowing at L4-5 and L5-S1 secondary to facet and endplate hypertrophy and disc bulge. Plaintiff attended a follow-up visit at CHC on September 22, 2014 where doctors reviewed the results of these MRIs and referred him to a pain clinic for evaluation of "interventional treatments/injections as management." (AR 916.) Plaintiff was prescribed six hundred milligrams of Neurontin daily and ten milligrams of Flexeril as needed for his back pain.

Plaintiff had a series of follow-up visits in late 2014 and throughout 2015 for his back pain, COPD, depression, and alcohol abuse issues. On December 16, 2014, Plaintiff had an appointment for "chronic back pain" at CHC. (AR 913.) At this visit, he elected not to pursue invasive procedures for pain management and decided to continue on his medication regime. With regard to his pulmonary symptoms, Plaintiff was "[g]enerally feeling improved," but did admit to "some increased reliance on [his] rescue inhaler[.]" *Id.*

7

Approximately three months later, on March 23, 2015, Plaintiff was treated at CHC and stated that pain issues precluded him from accepting several jobs, and that his chronic pain and associated physical limitations were contributing to a continued pattern of alcohol abuse. He stated that he was drinking eight beers and smoking more than a pack of cigarettes a day. Plaintiff's Neurontin dosage was increased to six hundred milligrams in the morning, three hundred milligrams at noon, and six hundred milligrams at bedtime. To address concerns about depression, he was prescribed thirty milligrams of Cymbalta per day but was unable to obtain it due to insurance coverage issues. He eventually began taking thirty-seven and a half milligrams of Effexor on April 15, 2015.

On April 20, 2015, Plaintiff was seen again at CHC. On this occasion, he stated that Effexor was helping to alleviate his depression, but that he was still drinking more than he should. He also stated that his back and shoulder pain were essentially unchanged, but again declined more invasive pain management treatment.

Plaintiff stated at a May 18, 2015 visit at CHC that he continued to work pending an appeal of his SSDI denial but that "pain issues[] have continued to prohibit him from accepting a number of jobs." (AR 903-04.) He stated that "'I just can't do what I used to.'" (AR 904.) He indicated that the Effexor was still helping his depression, but inquired as to an increase in dosage. This appointment was Plaintiff's last visit to a physician reflected in the record before ALJ Sutker.

## B.   Medical Source Statements.

On July 31, 2015, Joanne Rathburn, N.P. completed a physical medical source statement ("MSS") in connection with Plaintiff's applications for SSDI and SSI. On August 20, 2015, N.P. Rathburn completed a second physical MSS. Both statements were included in the record before the ALJ. N.P. Rathburn indicated that Plaintiff could occasionally lift twenty pounds and frequently lift less than ten pounds. She also opined that Plaintiff could stand or walk for between one and three hours in an eight hour work day, sit for no more than five hours in an eight hour work day, and would need to take five minute breaks every twenty-five minutes. She stated that Plaintiff could never perform the following postural activities: climbing, balancing, kneeling, crouching, or

8

stooping but could crawl occasionally. She opined that Plaintiff is limited by temperature extremes, dust, vibration, humidity, hazards like machinery or heights, and fumes or odors.

On a pain questionnaire dated July 31, 2015, N.P. Rathburn indicated that Plaintiff suffers from severe pain caused by degenerative joint disease aggravated by lifting, climbing, twisting, bending, and prolonged walking or sitting. She noted that Plaintiff must alternate positions seven times per hour, he cannot work more than three and half hours without rest, and his pain would require him to miss work more than four days per month.

### C.    State Consultants' Reports.

Plaintiff's mental and physical impairments were assessed by state agency medical consultants in connection with his initial application and again on reconsideration.

On or about January 1, 2014, Howard Goldberg, Ph.D. assessed Plaintiff's mental impairments as part of the initial review of Plaintiff's application for SSDI and SSI. He concluded that Plaintiff "presents with symptoms of anxiety and depression that have improved . . . . However his symptoms occasionally could be disruptive to CPP, Social, and Adaptive functioning at a moderate level." (AR 259.) In support of this opinion, Dr. Goldberg relied upon 2010 and 2013 consulting examinations. The 2010 examination, conducted while Plaintiff was living in Florida, indicated that Plaintiff had normal processing speed but that Plaintiff's mental flexibility was mildly impaired and that he was only able to recall one out of three items from his recent memory. The consulting examiner found that Plaintiff had recurrent moderate major depressive disorder and generalized anxiety disorder. The 2013 examination also found that Plaintiff had normal mood, affect, and thinking. He was not easily confused, distracted, or impulsive and had no problems following directions. The 2013 evaluator concluded that Plaintiff presented with mild symptoms of anxiety.

On or about February 19, 2014, Francis Cook, M.D. examined Plaintiff and concluded that although Plaintiff has breathing and back problems, he was still able to move around and use his arms, legs, hands, and feet well enough for most daily activities.

9

He found Plaintiff capable of standing or walking six hours in an eight hour work day, with the ability to lift twenty pounds occasionally and ten pounds frequently. Dr. Cook found Plaintiff's COPD and spine disorder severe, but concluded that Plaintiff retained the residual functional capacity ("RFC") to engage in work at the light exertional level, including as an Almond Blancher or Design Applier for Plastics.

On or about May 8, 2014, Thomas Riley, Ph.D. completed a mental impairment assessment for Plaintiff. Dr. Riley concluded that Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting, but was not significantly limited in his ability to be aware of normal hazards, travel in unfamiliar places, or set realistic goals and plans independently of others. He also found that Plaintiff was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday without interruption due to psychologically based symptoms. Overall, Dr. Riley opined that Plaintiff is "limited from 4+ step tasks. His cognitive efficiency can be disrupted by depression, anxiety, and stress. With social limitations he retains the capacity to carry out 1-3 step tasks for 2 hours over an 8 hour day throughout the workweek." (AR 294.)

On or about May 8, 2014, Carl Runge, M.D. performed a physical impairment assessment in connection with the reconsideration of Plaintiff's application for SSDI and SSI. He found that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds, was able to walk or stand for six hours in an eight hour workday, and was only occasionally limited across a range of postural activities, including climbing ladders, stooping, kneeling, crouching, and crawling. His ultimate impression was that Plaintiff retained the RFC to perform work at the light exertional level.

### D.    Plaintiff's Function Reports.

On October 29, 2013, Plaintiff completed a function report in connection with his application for SSDI and SSI in which he stated that he "can no longer climb ladders or anything physically stren[u]ous – had an attack just changing a tire." (AR 410.) He explained that he "start[s] the day by taking all medications[,]" then he "move[s] around slowly just doing coffee & breakfast – then try to accomplish small everyday tasks but

10

always get winded & dizzy, easily & continuously." (AR 411.) He stated that he no longer does any household chores or cooks because it is "too dangerous[.]" (AR 412.) He indicated that his wife has to remind him to bathe, and needs to be present when he does so because of his frequent dizziness and blackouts. He stated that he fishes "a couple times per mo[nth]" whereas he previously fished almost every day. (AR 414.)

According to his function report, Plaintiff can lift thirty pounds at most. Squatting, bending, and reaching make him dizzy and climbing stairs makes him short of breath. He can walk thirty to forty yards before needing to stop and rest, and can only pay attention for fifteen minutes. He has a "fear of not being able to breath[e.]" (AR 416.) Plaintiff stated in his report that he handles stress "not well at all[,]" and that he struggles with changes in routine. *Id.* He described himself as "very forgetful" and only able to pay attention for fifteen minutes at a time. (AR 415.)

## E. Plaintiff's Testimony at the ALJ Hearing.

After he was informed of his right to representation, and after agreeing that the record evidence was complete, Plaintiff testified before ALJ Sutker regarding his present work and employment history as well as his physical and mental impairments. He stated that he does "whatever I can a couple of hours a day" for work. (AR 217.) He explained that he occasionally accepts painting jobs, but that he is limited by his inability to climb ladders. He stated that he has blackouts and that he has "fallen a few times already." *Id.* According to Plaintiff, he receives significant assistance from his wife on most jobs and his son worked with him before moving to Massachusetts. Plaintiff acknowledged that he and his wife receive food stamps and Medicaid. Plaintiff testified that he is sometimes able to drive, but that it "depends on my medications and stuff and how I feel. If I'm having dizzy spells and stuff, I don't drive." (AR 219.) Plaintiff's wife drove him to the ALJ hearing. With regard to past employment, Plaintiff stated that he was first self-employed as a landscaper, followed a few years later by a construction and home remodeling business, although he has no trade certifications.

When asked about his impairments, Plaintiff stated that "between the – the back problems and the blood pressure problems and the arm problems and the leg problems

11

it's just – it gets overwhelming." (AR 221.) He explained that his symptoms are so severe that if he works three hours in a day, he takes the next two days off to recover. He testified to difficulty standing and walking. Plaintiff stated that he uses supplemental oxygen at night, and his medications include Effexor, Neurontin, Symbicort, MOBIC, Gabapentin, Cyclobenzaprine, Lisinopril, Trazodone, Proair, and Oxycodone. He also testified that he uses Nitrol approximately once a month for heart problems and overexertion triggers breathing problems. He clarified, however, that "even with medication I still am in pain every day and all night." *Id.*

In his testimony, Plaintiff described a problem with the sciatic nerve on the right side of his body that causes pain to run down to his ankle, with the pain lasting between one and eight months. Noting that he also has shoulder problems, Plaintiff stated that he could not put his hands over his head without experiencing numbness in his arm. With regards to his mental impairments, Plaintiff testified that he experiences frustration because of his pain and limitations.

Plaintiff's wife testified that she resides with Plaintiff and that they have been married for twelve years. She "hear[s] [Plaintiff] in pain every day, all day long. He moans from about 11 a.m. until he goes to sleep about his pain." (AR 230.) She also explained that Plaintiff had elected not to pursue invasive therapies for pain management because he was concerned about surgical procedures conducted so close to his spine.

VE Laflamme identified Plaintiff's past work as that of construction worker 1 (heavy exertional level), landscaper (heavy exertional level), and handyman (medium exertional level). She testified that a hypothetical person with Plaintiff's impairments could not perform any of his past work, but could perform the work of a price marker, laundry classifier, or mail room clerk. When asked whether unscheduled absences of at least two days a month would preclude substantial gainful activity on a competitive basis, VE Laflamme stated that "employers will typically accept one absenteeism per month but not more." (AR 236.)

12

### F.    Additional Evidence Submitted to the Appeals Council.

In support of his December 18, 2015 request for review of ALJ Sutker's decision, Plaintiff presented the Appeals Council with three sets of medical records from the approximately three years he was in Florida.[4]  These records reveal that Plaintiff received treatment at a United States Department of Veterans Affairs ("VA") hospital between June 2010 and December 2010.  On August 6, 2010, Plaintiff's VA chart indicates that he "relocated from Vermont[,]" and that he was seen for an initial visit. (AR 171.)  On July 23, 2010, Plaintiff underwent a lumbosacral spine x-ray for chronic back pain, and the radiologist's impression was that of mild multilevel lumbar spondylosis.  The report of that examination indicates that it was printed at the North Florida/South Georgia VA.

On September 15, 2010, Plaintiff underwent a CT scan of his abdomen that indicated sigmoid diverticulosis.  The record also indicates that it was printed at the North Florida/South Georgia VA, and the test was conducted after Plaintiff reported abdominal pain and diarrhea.  On September 23, 2010, VA staff ordered physical therapy to treat Plaintiff's chronic low back pain.  On December 8, 2010, Plaintiff was seen at the VA for a pain assessment, where he indicated that his "aching, deep" left and right back and shoulder pain was "constant[.]"  (AR 163.)

### III.   The ALJ's Application of the Five-Step, Sequential Evaluation Process.

In order to receive SSDI or SSI benefits, a claimant must be disabled on or before his or her date last insured.  SSA regulations set forth the following five-step, sequential evaluation process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the

---

[4] "[N]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996).  Thus, a reviewing district court may properly consider whether additional evidence submitted to the Appeals Council undermines or supports the ALJ's decision. *See id.* at 46 ("When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the [Commissioner].").

specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, ALJ Sutker concluded at Step One that Plaintiff has not engaged in substantial gainful activity since his alleged onset date of February 10, 2010. At Step Two, she concluded that Plaintiff has the following severe impairments: COPD; degenerative disc disease of the cervical and lumbar spines; degenerative changes of the bilateral shoulders; anxiety disorder (variously diagnosed); affective disorder (major depressive disorder); and alcohol dependence. ALJ Sutker found at Step Three that none of Plaintiff's severe impairments meet or medically equal the severity of a listed impairment set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. With regards to Plaintiff's mental impairments, ALJ Sutker further found the "paragraph B" criteria are not satisfied because Plaintiff has no more than moderate limitations in activities of daily living, social functioning, concentration, persistence, or pace, and has had no episodes of decompensation of extended duration. She also concluded that Plaintiff's mental impairments do not satisfy the "paragraph C" criteria because Plaintiff can function independently outside his home.

At Step Four, ALJ Sutker found that Plaintiff has the physical RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that he cannot

14

climb ladders, ropes, or scaffolds. She found that Plaintiff can occasionally reach overhead, stoop, kneel, crouch, crawl, balance, and climb stairs and ramps, but must avoid hazards like unprotected heights and moving machinery. She further found Plaintiff is limited to occasional exposure to dusts, fumes, and other pulmonary irritants.

With regards to Plaintiff's mental RFC, ALJ Sutker concluded that he is able to perform uncomplicated tasks and can concentrate, persist at tasks, and stay on pace for two-hour blocks throughout the workday. She further found that he needs an environment where tasks are generally performed in a solitary manner, but he can engage in teamwork or tandem tasks up to ten percent of the workday as well as collaborate with supervisors and co-workers on routine matters.

In making her RFC determination, ALJ Sutker concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" (AR 19.) She concluded that Plaintiff's wife's testimony was entitled to relatively little weight because she was not a disinterested witness or a trained medical expert. ALJ Sutker further concluded that Plaintiff's claims as to the severity of his symptoms are "not supported by evidence of record." *Id.* She found that, following Plaintiff's February 2010 emergency room visits for chest pain, and the subsequent follow up appointments at SJFH during the first half of 2010, "there is a three year gap in [Plaintiff's] treatment records[.]" *Id.* She concluded that:

the evidence of record does not fully support [Plaintiff's] allegations[] . . . . Despite alleging that his impairments are so severe that he cannot work on a fulltime basis, [Plaintiff] went nearly three years without seeing a doctor and during that time, he continued to work on a part-time basis, performing medium to heavy work.

(AR 22.) ALJ Sutker also noted that Plaintiff had declined to pursue invasive pain management therapies despite his doctor's suggestions, and has not sought therapy or counseling for his depression and anxiety.

15

With respect to medical opinion evidence, ALJ Sutker observed that N.P. Rathburn "is not an acceptable medical source, the medical evidence of record does not support [her] opinion, [she] simply checked boxes, and her opinions are not fully consistent with each other even though they were formed less than a month apart." (AR 23.) In contrast, ALJ Sutker afforded significant weight to the opinions of Dr. Cook, Dr. Runge, Dr. Goldberg, and Dr. Reilly. She concluded that their opinions were well supported by the evidence in the record.

Finally, at Step Five, ALJ Sutker found that, based on VE Laflamme's testimony, there are jobs that exist in significant numbers in the national economy that a person with Plaintiff's mental and physical RFC could perform. She therefore concluded that Plaintiff was not disabled at any time after his alleged onset date of February 10, 2010.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for that of the Commissioner. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984).

16

## B. Whether the ALJ Adequately Developed the Record When Considering the Appeal of an Unrepresented Claimant.

"It is the rule in our circuit that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks, omissions, and alterations omitted); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (observing that an ALJ has an obligation to develop the record because "of the non-adversarial nature of . . . benefits proceedings"); *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (noting that "the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record."). "This duty exists even when the claimant is represented by counsel[,]" *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996), but "[w]hen a claimant properly waives his right to counsel and proceeds *pro se*, the ALJ's duties are heightened." *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) (internal quotation marks omitted). This heightened duty requires the ALJ "'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts[.]'" *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Gold v. Sec'y of HEW*, 463 F.2d 38, 43 (2d Cir. 1972)); *see also Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) ("The ALJ has a duty to adequately protect a *pro se* claimant's rights").

An ALJ also has a duty to resolve "gaps in the administrative record[.]" *Hankerson*, 636 F.2d at 897 (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)); *see also Burgess*, 537 F.3d at 129 ("In light of the ALJ's affirmative duty to develop the administrative record, an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (internal quotation marks omitted). The Second Circuit has emphasized that, "[i]n such cases where the claimant was handicapped by lack of counsel at the administrative hearing, the reviewing court has a duty to make a searching investigation of the record to ensure that the claimant's rights have been adequately protected." *Hankerson*, 636 F.2d at 895 (internal quotation marks omitted).

17

Close examination of Plaintiff's complete medical record, as presented to the ALJ, reveals a clear gap in treatment that merited further inquiry. Plaintiff's SJFH records end on June 21, 2010, with the notation that he "moved out of area in Florida[.] Records sent 06-21-10[.]" (AR 647.) Up until that notation, he had seen providers at NVRH and SJFH with complaints of chest pain and breathing difficulty. In August of 2014, Plaintiff sought to "re[-]establish w[ith] S[ain]t J[ohnsbury][.] Florida for 3 y[ea]rs[.]" (AR 760.) Plaintiff then saw a doctor for a visit establishing care at SJFH on October 1, 2013, where he stated that he had been experiencing on and off chest pain for months. Following two emergency room visits in mid-October 2013, Plaintiff saw a doctor in Vermont approximately every two to three months until the date of his hearing before ALJ Sutker.

ALJ Sutker provided Plaintiff with several opportunities to correct or supplement the record, emphasized the value of representation, and spent significant time reviewing the hearing process and its evidentiary requirements prior to taking Plaintiff's testimony. Nevertheless, in light of the clear break in Plaintiff's otherwise consistent treatment record, the ALJ was obliged to inquire as to the circumstances of the approximately three year gap while he was in Florida. *See, e.g.*, *Gibson v. Barnhart*, 212 F. Supp. 2d 180, 182 (W.D.N.Y. 2002) (finding "thoroughly unpersuasive the Commissioner's argument that the four-year gap in plaintiff's medical records indicates that she essentially had no treatment of any consequence from 1994 until 1998 and that this is evidence she was not disabled during that period.") (internal quotation marks and alterations omitted). While Plaintiff did not affirmatively notify ALJ Sutker that there were missing treatment records from Florida, the medical record clearly disclosed their absence.

The Commissioner contends that, even if ALJ Sutker erred by failing to inquire as to the gap in Plaintiff's treatment records, the error was harmless because ALJ Sutker had a lengthy record that provided substantial evidence for her findings. *See McIntyre*, 758 F.3d at 148 (noting that courts "apply harmless error analysis" to challenges of an ALJ's decision); *Curry v. Sullivan*, 925 F.2d 1127, 1129 (9th Cir. 1990) (finding that "[t]he

18

harmless-error rule applies" in social security cases).[5] When challenging an administrative determination, "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Courts of Appeals have applied two distinct tests when determining whether an ALJ's error is harmless in an SSA case. The first view holds that "'[s]o long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion, such [an error] is deemed harmless and does not warrant reversal.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (quoting *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008)). According to this formulation "where the ALJ provided one or more invalid reasons for disbelieving a claimant's testimony, but also provided valid reasons that were supported by the record[,]" the invalid reasons are generally deemed harmless. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). Alternatively, this standard has been described as permitting errors "that are inconsequential to the ultimate nondisability determination." *Id.* at 1117 (internal quotation marks omitted).

The second approach takes a narrower view of the range of permissible errors and maintains instead that "[a]n ALJ's error is harmless if, in light of the record-supported reasons supporting the adverse credibility finding, we can conclude that the ALJ's error

---

[5] District courts in the Second Circuit have come to the same conclusion in similar circumstances. *See Seltzer v. Comm'r of Soc. Sec.*, 2007 WL 4561120, at \*10 (E.D.N.Y. Dec. 18, 2007) ("Nevertheless, to the extent that an ALJ fails in her duty to affirmatively develop the record and/or consider all of the relevant evidence, the court can still affirm her decision if this error is deemed to be harmless."); *Molina v. Barnhart*, 2005 WL 2035959, at \*8 (S.D.N.Y. Aug. 17, 2005) ("Since the ALJ erred in not making a reasonable effort to acquire Dr. Michelson's opinion prior to issuing his decision, the Court must consider whether that error was harmless."); *Walzer v. Chater*, 1995 WL 791963, at \*9 (S.D.N.Y. Sept. 26, 1995) ("While the ALJ should have discussed Dr. Leahy's report in his decision (even though her report was received after the close of the hearing), the ALJ's failure to do so was harmless error, since his written consideration of Dr. Leahy's report would not have changed the outcome of the ALJ's decision.").

did not 'affect[] the ALJ's conclusion.'" *Carmickle*, 533 F.3d at 1168 (Graber, J., dissenting) (quoting *Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004)). A court applying the second test must reverse the Commissioner's decision if, in light of the record as a whole, it is unable to determine whether the ALJ's erroneous factual determination affected his or her ultimate disability determination.

The Second Circuit has not squarely addressed which, if any, of these harmless error tests it would apply in the context of an ALJ's credibility determination with regard to an SSDI claimant. This court need not resolve that issue because it is clear that ALJ Sutker relied on Plaintiff's failure to seek medical treatment for a period of three years in her analysis of both Plaintiff's RFC and her evaluation of the credibility of his claims of disabling pain and other physical and mental impairments. She specifically grounded her analysis in a conclusion that Plaintiff "went nearly three years without seeing a doctor and during that time, he continued to work on a part-time basis, performing medium to heavy work." (AR 22.)

Although ALJ Sutker provided other reasons for her analysis of Plaintiff's symptoms and RFC, there remains insufficient evidence to conclude that any error was harmless because the fulcrum of her decision remains the "three year gap in [Plaintiff's] treatment records[,]" to which she referred on three occasions. (AR 19.) Although a close question, regardless of the precise definition of harmless error, the court cannot say with confidence that the ALJ's reliance on a non-existent gap in treatment played only an inconsequential role in her ultimate disability determination. In such circumstances, a remand is appropriate. *See Kohler*, 546 F.3d at 268 (remanding where "it is not clear whether the ALJ adequately considered the entire record" and "the [c]ourt cannot determine whether there is substantial evidence for the ALJ's conclusion"). Plaintiff's motion to reverse the Commissioner's decision is therefore GRANTED.

### C. Whether the Appeals Council Erred When it Declined to Hear Plaintiff's Administrative Appeal.

Plaintiff also asserts that the Appeals Council erred when it declined to review his benefits denial in light of new evidence submitted in connection with his appeal. This

claim is without merit because the Appeals Council's denial is not the final decision of the Commissioner and is therefore not subject to the court's review. *See Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) ("If the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision.") (citing *Perez*, 77 F.3d at 44); *see also* 42 U.S.C. § 405(g) ("Any individual, *after any final decision of the Commissioner of Social Security* made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action") (emphasis supplied). Thus, where the Appeals Council denies review of an ALJ's decision, the court's "review focuses on the ALJ's decision." *Lesterhuis*, 805 F.3d at 87 (citing 42 U.S.C. § 405(g)).

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion for an Order reversing the Commissioner's decision (Doc. 7) and DENIES the Commissioner's motion to affirm (Doc. 12). The case is REMANDED to the ALJ for further proceedings consistent with this Opinion. On remand, the ALJ is directed to review medical evidence submitted to the Appeals Council to determine what, if any, effect such evidence may have on his or her determination.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 23rd day of February, 2018.

Christina Reiss, District Judge
United States District Court

21